UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:04CV-79-S

RICHARD L. TAYLOR, as Administrator of
the Estate of Philip R. Taylor, deceased                                    PLAINTIFF

V.          **PLAINTIFF'S RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT**
      **ON BEHALF OF DEFENDANTS SKYLAND, KLAUSSNER INTERNATIONAL, LLC,**
      **KLAUSSNER FURNITURE INDUSTRIES, INC., AND HOMELIFE CORPORATION**

SEARS, ROEBUCK & CO.
HOMELIFE CORPORATION
KLAUSSNER FURNITURE INDUSTRIES, INC.,
KLAUSSNER INTERNATIONAL LLC
And SKYLAND GROUP, INC.                                                      DEFENDANT

Comes the Plaintiff, by counsel, and for his response to Motions for Summary Judgment on behalf of Defendants Skyland, Klaussner International, LLC, Klaussner Furniture Industries, Inc., and HomeLife Corporation, states as follows:

OVERVIEW OF DEFENDANTS' ARGUMENTS

Manufacturing defect claims against all Defendants should be dismissed.

The negligent design and defective design claims, including negligent testing and failure to warn claims, are supported by a mountain of evidence against Skyland and Klaussner, which these Defendants either ignore or obfuscate in their motions.  This evidence proves both Skyland and Klaussner:  (a) knew of prior injuries caused by substantially similar non-tempered glass-top tables; (b) knew of a prior injury caused by the same model table which killed Philip Taylor, except for different paint; (c) knew tempered glass was a viable and cheap design change which would eliminate the dangers of the glass top table; (d) chose to use non-tempered glass to save $5.00 per table set in order to meet pricing pressures from HomeLife, a huge customer; and (e) shifted financial responsibility for injuries caused by non-tempered glass tables from Skyland to Klaussner, once Skyland could no longer get liability insurance to cover injuries caused by tables made with non-tempered glass.

The negligent design and defective design claims against Skyland and Klaussner should go to a jury, as should the punitive damages claims against these Defendants.  There is compelling evidence that these Defendants recklessly disregarded the lives and safety of the users of the Apollo 205 table in the name of business opportunity and profit, with clear notice of injuries being caused by this product and the danger of the product.

In an effort to avoid consideration of the reasonableness of its conduct in placing this glass top table in the stream of commerce, Skyland claims it played no role in the process leading to the selection of non-tempered glass.  The Statement of Facts will dispel any notion that Skyland was an unwitting participant in placing this non-tempered glass top table in the stream of commerce.  To the contrary, Skyland's deceit and incompetence induced KI to use the non-tempered glass which killed Philip Taylor.

Klaussner glibly states Plaintiff's expert proof is insubstantial, without once referring to the evidence.  Plaintiff's experts include Dr. Philip Graitcer, who developed, directed and supervised the Division of Consumer Injury Epidemiology and Control of the Centers for Disease Control and Prevention (CDC), Dr. Alan Johnson, a materials and structural defect consultant who has professional experience with glass and has taught the material properties of glass fracture at the University of Louisville almost every semester for 25 years, Dr. Michael Wogalter, a warnings expert from North Carolina State University, and Dr. George Nichols, who has seen many stab wounds resulting in death during his 20+ years of experience as the Medical Examiner for the Commonwealth of Kentucky.  Each of these experts has clearly stated that the non-tempered glass used in the Apollo 205 table was negligently designed, defective in design and unreasonably dangerous to its users.  Additional references to these experts' opinions will be detailed herein.

The negligent design and defective design claims, and punitive damages claim against HomeLife should also go to a jury.  HomeLife knew the non-tempered glass in the Apollo 205 table was more dangerous than tempered glass.  However, HomeLife never bothered to determine whether the table was

made with tempered or non-tempered glass, even though it experienced an inordinate amount of glass breakage during shipping of the Apollo 205 table.

Klaussner Furniture Industries, Inc. (KFI) contends it should be dismissed from this litigation because it is a separate corporation from Klaussner International, LLC (KI), and had no involvement in placing this product into the stream of commerce.  While KFI is a separate corporation from KI, J. B. Davis was president of both corporations.  There is substantial evidence that Mr. Davis initiated a program whereby KFI and KI would work together in pricing groupings of furniture (upholstered furniture by KFI and occasional furniture by KI[1]) to HomeLife, in an effort to boost the sales of both upholstered and occasional furniture.  There is substantial evidence that a joint decision was made by KFI and KI employees to save $5.00 by using non-tempered glass, in order that KI and KFI could sell their occasional and upholstered furniture to HomeLife in large volume.[2]

The breach of warranty claims should be dismissed against all Defendants except HomeLife. Chad Deters purchased the Apollo 205 table from HomeLife.  As a member of Chad Deters' household, Philip Taylor was in privity with HomeLife.

<u>STATEMENT OF FACTS</u>

**Philip Taylor's Death**

On April 29, 2003, Philip Taylor took his last law school exam and was graduating from Brandeis School of Law at the University of Louisville.  On the morning of April 30, 2003, Philip and two fellow law students who had also taken their last exams returned to Philip's house at about 4 a.m. after celebrating on Bardstown Road.  Shortly thereafter, Philip fell onto a glass top cocktail table in his den. This table was situated in front of the couch, was 17 ½ inches high and contained a glass top two feet

---

[1]  Occasional furniture includes cocktail tables, coffee tables, end tables, lamps, etc., and is sometimes referred to as "case goods."

[2]  Klaussner sold 50,000 Apollo table sets to HomeLife.  (Patrick Obriant Depo., 11/9/04, p. 30, ll. 15-21) (Exhibit 1).

3

wide and four feet long, supported by only eight approximately 3/8" square metal tabs.  Incredibly, the glass was only 3/16-inch thick and was made from non-tempered glass.

The subject table was the Apollo 205.  Philip's roommate, Chad Deters, bought the table from a HomeLife store in Jefferson County on March 26, 2001. (Deters Depo., 4/13/05, Ex. 1)  (See Exhibit 2). Mr. Deters was incredulous to learn the table was composed of non-tempered glass.  He would never have bought it, or kept it, if he had known.  (Deters Depo., 4/13/05, p. 95, lines 4-9).  (Exhibit 3). Ordinary, non-tempered glass breaks into irregular pieces which are dagger-like.



Forseeably, when Philip fell on the table, the glass broke into dagger-like shards.



It was equally foreseeable that a human being coming into contact with this table could be seriously injured or killed by the glass shards.  Philip Taylor was stabbed to death by a shard of the broken, non-tempered glass.  Dr. George Nichols' undisputed conclusion is that Philip would have received little, if any, injury had he fallen onto a tempered glass top table.

> Philip R. Taylor's death occurred from a simple fall, apparently from standing height, with penetration by untempered glass.  The sharp edges of the glass need little force to penetrate soft tissue.  If the table top had been constructed of another material, Philip R. Taylor would have sustained soft tissue injury, (contusion), abrasions and possible rib fracture.  If the table top had been made of tempered glass (like the glass in car windows which breaks into small, pebble-like pieces), Philip's injuries would have been much the same, with the exception that he might have also sustained a small cut or abrasions from the pebbles of tempered glass.  These injuries would have produced localized discomfort and pain but would <u>not</u> have been associated with a serious, life-threatening traumatic event requiring hospitalization.

(Nichols' Depo., 7/8/05, Ex. 1, Report of George Nichols, incorporated into his testimony, page 3, first complete paragraph) (See Exhibit 4).

Dr. William Smock, Defendants' only expert, agreed with Dr. Nichols' assessment that Philip would have received only minor injuries if he had fallen onto a tempered glass top table. (Smock Depo., 9/7/05, pp. 46-49) (See Exhibit 5).

Philip was intoxicated when he fell.  His blood alcohol was .224, which was calculated from serum blood alcohol drawn at the hospital after his death.  (Nichols Depo., 7/8/05, p. 14, ll. 8-11). (Exhibit 4).

### Execution of the 1998 *Design and Supply Agreement* Between Skyland, KI and KFI

JDI Group, Inc. (now "Skyland") began selling occasional furniture, including cocktail tables, in the 1960's.  In the mid-80's, JDI began to import occasional furniture from overseas.  It was a leader in the furniture importing business.  By the mid-to-late 1990's, JDI's owner, Ron Pass, began to consider a sale of its entire product line.

KFI is one of the five largest furniture manufacturers in America.  (www.klaussner.com). Klaussner Corporation holds all furniture operations, including KFI (upholstered) and KI (occasional).(McCutchen Depo., 10/26/2005, pp. 9, 10).  (See Exhibit 6). The Klaussner Corporation furniture operation had sales of approximately $875,000,000.00 in fiscal year 2004.  (Davis Depo., 10/26/05, pp. 29-31). (See Exhibit 7).

J. B. Davis is the President of KFI.  He is an officer in other Klaussner entities, but they are so inter-related that he is not sure of his position with these entities.  He is not sure who is president of KI, but Mr. Davis has ultimate management authority over **both** KFI and KI.  (Davis Depo., 10/26/05, pp. 6, 7, 10).  (Exhibit 7).  Davis and KFI decided to get into the occasional furniture line, not only to sell occasional furniture, but also to boost its sales of upholstered furniture.  (Davis Depo., 10/26/05, p. 17) (Exhibit 7).  KI was formed to market occasional furniture.  (Patrick Obriant Depo., 4/7/04, pp. 14-15). (See Exhibit 8).

In 1998, JDI sold its voluminous product line to KI. (Patrick Obriant Depo., 4/7/04, pp. 31-32). (Exhibit 8).  Because JDI and its owner, Ron Pass, had extensive experience in the occasional furniture industry, Klaussner contracted with JDI (soon thereafter called "Skyland") to both design and supply occasional furniture products to KI.  (See *Design and Supply Agreement*, Exhibit 9).  JDI was to present designs to KI for review and selection.  Once KI chose designs it liked, JDI was to find an overseas manufacturer and shop for a competitive or price.  Klaussner would then decide whether it wanted to market the particular design and JDI would then arrange for the manufacture and supply of the product. (Patrick Obriant Depo., 4/7/04, pp. 39-41). (Exhibit 8).

One of J. B. Davis's roles for both KFI and KI was to develop relationships and rapport with retailers in order to generate sales.  The 1998 spin-off of HomeLife Corporation from Sears presented these Klaussner entities with an opportunity for a potentially large account (Davis Depo., 10/26/05, pp. 14, 15). (Exhibit 7). Mr. Davis was involved in the details of product development and pricing of products to HomeLife Corporation for both KI's occasional furniture (cocktail and coffee tables, etc.) and KFI's upholstered furniture.  This marketing included selling a "room full of furniture" which included both occasional and upholstered furniture.  (Davis Depo., 10/26/05, pp. 16,17).  (Exhibit 7).

KI asked Skyland to design some 3-pack table sets to sell to HomeLife Corporation.  Skyland designed the Apollo 205 from a composite of several tables it had designed in the past, arranged for a prototype of the table to be manufactured in China and presented the table to KI for its approval.  Skyland recommended the use of tempered glass in the Apollo 205 at a price of $64.75.  [Patrick Obriant Depo., 11/9/04, pp. 18, 22, 112, 113 (Exhibit 1); Pass Depo., 6/4/04, pp. 26-29, (Exhibit 10)].  Todd Campbell began to market the Apollo 205 to HomeLife.  HomeLife wanted a 3-pack table set at a price of $100.00. (Campbell Depo., 11/10/04, p. 15). (Exhibit 11).

Darrin York began to implement the introduction of occasional tables to go with the upholstery line.  He did not know whether his introduction of occasional tables to go with upholstery was being done

7

for KFI or KI.  (York Depo., 11/10/04, pp. 8,9).  (Exhibit 12). KFI employee Larry Phillips and KI employee Todd Campbell began working together to implement the sale of both the occasional furniture and upholstered furniture to HomeLife, as a grouping of furniture.  (Phillips Depo., 1/12/05, pp. 17, 18). (Exhibit 13).  Phillips and Campbell, for KFI and KI, respectively, would work together to set a price of both the upholstered furniture and occasional furniture (also called "case goods") which was suitable to HomeLife.

> Now occasionally, you know, they would want a room package, and at that point in time we would try to find, you know, a -- for instance, a sofa and a love seat, and then have a cocktail table and two end tables or something like that to match that up.  You know, that's pretty common in our industry, quite honestly, the room full of furniture or Rooms to Go. You know, they did some of that, but most of what I did was sell them, you know, individual upholstered pieces.  And if they said, "Well, do we need to match up some case goods with it," then I would go to our case goods people and say, "Hey, you know, what have you got to match this, you know, and where can we price this out so it would make sense to them?"

(Phillips Depo., 1/12/05, p. 18, l. 11—p. 19, l. 1). (Exhibit 13).

The grouping of furniture could be a variety of things, a sofa, a love seat, a cocktail table, two end tables. (Phillips Depo., 1/12/05, p. 23). (Exhibit 13).

HomeLife was a potentially huge customer for KFI and KI, not only for the Apollo 205 table, but for all types of occasional and upholstered furniture.  HomeLife began to pressure KI to reduce its price from $100.00 for the Apollo 205 table set to $95.00.  (Patrick Obriant Depo., 11/9/04, p. 115). (Exhibit 1). A discussion ensued between KI and Skyland about how the $95.00 price could be met.  Skyland quoted $59.75 for non-tempered glass instead of $64.75 for tempered glass.  (Patrick Obriant Depo., 11/9/04, pp. 18, 22, 112, 113).  (Exhibit 1).

As a result of this pricing pressure from HomeLife, both KI and KFI decided to use the non-tempered glass to save the $5.00 difference.  Darrin York testified:

> Q.  Okay.  Was there any discussion about the price point of this table from 59.75 to $64.75 for tempered versus non-tempered?
> A.  Oh, yes.

8

Q.  Tell me about that.
A.  From my recollection with HomeLife, we were working on this table
group for a package they were running, and they gave us limitations on the
price point of the occasional table. And I know that we -- I don't believe we
made any money on this occasional table.  And obviously in order to hit
their price requirements, it was part of the decision on the non-tempered and
tempered glass.

* * *

Q.  In order to keep from losing more money on this loss leader, you all
went with the non-tempered versus the tempered glass?
A.  That was partly the reason.

(York Depo., 11/10/04, p. 64. l. 14—p. 65, l. 2; p. 65, ll. 15-18). (Exhibit 12).

Larry Phillips testified that he and Chad Campbell would work together to sell upholstered and occasional

furniture as a room package for a price point that HomeLife demanded.

Q.  And were there times when you would be aware that HomeLife would
say, "Okay, we want to sell a room package for this price point"?  I mean,
they would not say for each component, but they would say, "We want to
sell a room package for, say, a thousand dollars"?
A.  Okay.
Q.  Did that happen?
A.  Yes.  Yeah, things like that happened.  Not necessarily a thousand
dollars, but yes.

* * *

Q.  …you had to fit your upholstery in it and Mr. Campbell, who has
indicated that it was his account, that HomeLife was his account---
A.  Uh-huh.
Q.  ---would have to fit the remaining case goods into that package?
A.  Yes.
Q.  And you-all would work with each other?
A.  Yes.
Q.  All right.  And when you are coming down the stretch to try to make
those sales, Mr. Campbell has indicated that HomeLife would come back at
the end and ask for just a little bit better price so that they could make this
work.  Was that typical?
A.  That's pretty typical, but not just for HomeLife, for any---

(Phillips Depo., 11/10/05, p. 30, ll. 10-19; p. 30, l. 24—p. 31, l. 15). (Exhibit 13).

From Mr. Davis at the top, to Todd Campbell and Larry Phillips in the sales department, KI and

KFI worked together to place the Apollo 205 table with non-tempered glass into the stream of commerce.

The decision not to use tempered glass, but to use dangerous non-tempered glass instead, was made to

9

save $5.00 on the glass used in the Apollo 205 3-pack table set, while meeting HomeLife's price.  The

door was now open for huge furniture sales by both KFI (upholstered) and KI (occasional).

**Skyland's Deceit and Incompetence**

Skyland would have this Court believe it simply followed KI's order to use non-tempered glass.

But the deceit and incompetence of its principal, Ron Pass, induced KI to use non-tempered glass.  The

*Design and Supply Agreement* (Exhibit 9) specified that Skyland would be paid a 2% design fee for each

Apollo 205 table sold and a 3% sourcing fee if it provided the designed product to KI, for a total of 5%.

Skyland was not supposed to mark up the manufacturing cost of the table.  KI eventually learned that

Skyland was secretly marking up the cost of this table by an average of 8%, or $5.18, on an Apollo 205

table with tempered glass ($64.75 x .08 = $5.18).  KI characterized Pass's secret mark-up as stealing.

(Patrick Obriant Depo., 11/9/04, pp. 204-210). (Exhibit 1).  Skyland's 8% secret mark-up was the

equivalent of the $5.00 reduction HomeLife was demanding.  When KI contacted Skyland about

HomeLife's demand for a $5.00 reduction in cost, Skyland did not inform KI of the secret mark-up;

instead, it merely quoted non-tempered glass at a price of $59.75, and marked up the non-tempered glass

by 8% as well.  (Patrick Obriant Depo., 11/9/04, pp. 204-205). (Exhibit 1).

KFI and KI banned Ron Pass from their showroom and property when they learned of his deceit.

(Patrick Obriant Depo., 11/9/04, p. 206).  (Exhibit 1).  J. B. Davis testified Pass had secretly marked up

the Apollo 205 table at a cost to KI of $250,000-$275,000.00.  (Davis Depo., 10/26/05, p. 37).  (Exhibit

7).  KI cut its business ties with Skyland and contracted with a new manufacturer for the Apollo 205 table.

KI then discovered Skyland could have provided the Apollo 205 table, **with tempered glass, at a**

**substantially cheaper price than Skyland charged KI for the Apollo 205 table with non-tempered**

**glass.**

> A.  … So this table, as well as some other tables, were moved from H.K.F. to other
> factories to manufacture for us, and at that time when we moved this one, it went from
> H.K.F. to a factory called Fu-Sheng-Ga, and their original quote was much lower than

10

what we were paying from H.K.F.  So we were able at that time to put tempered glass in it
at around the same price.
Q.   Okay.  So you could, because the new manufacturer was able to provide you with a
lower cost of manufacture, Klaussner International decided it could now afford to put
tempered glass in these tables when it apparently had decided it couldn't afford to before; is
that a fair statement?
A.   That is correct. …

(Patrick Obriant Depo., 11/9/04, p. 31, l. 15—p. 32, l. 5). (Exhibit 1).

Klaussner was able to manufacture the Apollo 205 3-pack table set, with tempered glass, for a price of

$53.00. (See Klaussner's Answer to Interrogatory No. 6, 5th Set). (Exhibit 14).

As the designer and supplier of the Apollo 205 table, Skyland was charged with designing

products, obtaining prototypes and obtaining competitive prices.  Yet, Skyland allowed KI to be pressured

into choosing non-tempered glass, knowing it could solve the problem by eliminating its secret mark-up.

And Skyland failed to search for and find a cheaper price for a tempered glass top table, when it continued

its secret mark-up.  KFI and KI's decision to save $5.00 per 3-pack table set by using non-tempered glass

is reprehensible.  Skyland's conduct in inducing KI to make this choice is equally reprehensible.

Skyland's deceit and incompetence led KI to look for cost-cutting measures.

**The Apollo 205 3-pack Table Set**

The Apollo Series 205 3-pack table set consisted of a cocktail table and two end tables (See

Exhibit 15).  The glass in the Apollo 205 cocktail table was four feet long and two feet wide and only

3/16-inch thick.



Non-tempered glass breaks into irregular pieces, many of which are dagger-like.



On the other hand, tempered glass is designed and manufactured to break into uniform "pebbles" for safety when broken by human contact.



### Notice to Skyland and KI of Injuries
### Caused by Non-Tempered Glass Top Tables

Both Skyland and KI knew of injuries caused to users of non-tempered glass top tables for five years before Philip Taylor's death.  Before JDI sold its product line to KI, JDI customers were being injured by non-tempered glass top tables.  After JDI sold its product line to KI, more JDI customers were injured by non-tempered glass top tables.  There was even an injury caused by the exact table as the Apollo 205, except for paint color ("Palladium 204").

Despite knowledge of these claims, Skyland, through Ron Pass, denied knowledge of these prior injuries when it answered interrogatories.

**Interrogatory No. 21.** State whether Defendant was aware of any injury or death allegedly arising from use of any furniture with glass components designed, manufactured, sold and/or distributed by Defendant before April 30, 2003.  If so, list the name and last known address and phone number of each injured and/or deceased person or deceased person's representative.

13

**Answer:**     No.

(Defendant Skyland Group, Inc.'s Responses to Plaintiff's First Set of Interrogatories and Request for Production of Documents). (Exhibit 16).

But Plaintiff subpoenaed Skyland's insurance agency records and found evidence of five claims against

Skyland.

Two injuries occurred before JDI's sale to KI.

**Tanner Moen**
*Date of Injury*: December 1, 1995
*Location*: Victim's home—Baudette, MN
*Age*: 3
*Incident*: Tanner Moen and his brother were  playing at the glass top coffee table in the great room of their home, when their mother heard glass breaking; Tanner had put his hands and arms through the glass. Tanner's left wrist required 3 sutures for a 1 cm. cut.
*Notification*: 1/26/96.  (Exhibit 17).

**Joseph Becker**
*Date of Injury*: June 11, 1997
*Location*: Art Van Furniture retail store—Township of Shelby, Michigan
*Age*: 37
*Incident*: Mr. Becker was signing a document on  a JDI 507-817 table when the table's glass top flipped over, hit the floor and shattered.  He sustained a 1- ½" cut on his right leg which required 7 stitches.
*Notification*: 6/22/99.  (Exhibit 17).

When KI bought JDI's product line, the *Asset Purchase Agreement* contained specific reference to the

Tanner Moen injury, which had been reserved at $14,500.00.  KI's CFO, David Bryant, testified he was

aware of the Moen child's injury at the time of the purchase.  (David Bryant, 1/12/05, p. 21) (Exhibit 18).

Only three months after KI bought JDI's product line, two more serious injuries were caused by

non-tempered glass tables sold by JDI.

14

**Barbara Barton**
*Date of Injury: June 10, 1998*
*Location:* Ms. Barton's home—St. Louis, MO
*Age*: Unknown
*Incident*: Ms. Barton contacted Spielberg Furniture to inform them the replacement glass installed on her table that day by the retailer was cracking [the original glass top was cracked]. As she removed items on the table  the glass shattered and cut her left leg requiring 12 staples and a tetanus shot. She now has a prominent scar on her left leg.
*Notification*: 10/22/98.  (Exhibit 17)

**Michelle Buska-Manno**
*Date of Injury*: July 7, 1998
*Location*: Ms. Manno's home—Toms River, NJ  08753
*Age*: 30
*Incident*: **Ms. Manno was cleaning the glass table when the glass shattered. Her left leg from knee to ankle was slashed open to the bone. The entire piece of skin and muscle was lying on top of her foot.  Her wound was measured at approximately 3 inches wide and 8 inches long.**  She had to have reconstructive surgery with skin grafts.  She sustained permanent soft tissue loss, full thickness skin graft, muscle and nerve damage and permanent scarring.  She also has permanent symptoms of drop foot, major muscle spasms, toe cramps, unable to walk long distances nor stand for long periods of time. Ms. Buska-Manno's injuries were permanent.
*Notification*: November 3, 1998  (Exhibit 17)

A fifth injury occurred on December 13, 1999.

**Katherine Ernest**
*Date of Injury*: 12/13/1999
*Location*: Her home – Mountain View, CA
*Age*: Under 18
*Incident*: Glass table top broke while little girl was leaning on it; Required stitches in leg.
***Notification*: 12/16/99 – Klaussner; 1/6/2000 – Skyland**  (Exhibit 17)

Ten-year-old Katherine Ernest was injured by **KI's table, the Palladium 204, which was identical to the Apollo 205, except for the paint.**  Skyland designed and sourced this table for KI.

KI claims it should not be responsible for Philip's death because it knew little about prior injury claims caused by non-tempered glass top tables.  KI's ignorance of these prior injury claims was willful. KI knew specifically of the Moen and Ernest injury claims, and should have known about the Becker, Barton and Buska-Manno claims.  But it never bothered to inquire why or how these injuries were occurring, or how serious the injuries were.  And it never took action to eliminate the danger.  Instead, it agreed to a financial arrangement to shift responsibility for future injuries.

15

In early 2000, after both KI and Skyland knew about the Palladium 204 injury to Katherine Ernest, Ron Pass approached KI's Patrick Obriant and requested that the indemnity provisions of the original *Design and Supply Agreement* be reversed because Skyland could no longer obtain liability insurance for non-tempered glass top tables. KI's Patrick Obriant testified:

> "Mr. Pass approached Klaussner International and indicated that his insurance company would no longer provide him liability coverage for tables that contained untempered glass."

(Patrick Obriant Depo., 4/7/04, p. 45, ll. 22-25) (Exhibit 8).

Pursuant to the original agreement between KI and Skyland, Skyland was responsible for any injuries caused by furniture which it supplied to, or designed for, KI.  (See Exhibit 9).  When Skyland could no longer get insurance for injures caused by non-tempered glass tables, KI's CFO consulted KI's insurer, which indicated it would cover these non-tempered glass injuries.  (David Bryant, 1/12/05, p. 33-34). (Exhibit 18).  On March 1, 2000, KI then agreed that it, not Skyland, would be responsible for future injuries caused by non-tempered glass furniture only.  The *Amendment to Design and Supply Agreement* read in pertinent part:

> KI [Klaussner] shall hold Supplier [Skyland] … harmless and indemnify each of them from and against (i) any and all claims, losses, damages, liabilities, penalties, fines, expenses or costs ("Claims"), plus (ii) reasonable attorneys' fees and expenses incurred with respect to Claims ("Attorney's Fees") incurred or to be incurred by any Indemnified Person resulting from or arising out of or in connection with the use of untempered glass in Products at the request or specification of KI which are shipped on or after March 1, 2000.  KI shall promptly pay the Indemnified Party amounts due for each such Indemnified Claim under this *Section 9(c)*.

(Exhibit 19)

This *Amendment to Design and Supply Agreement* shows:  (a) Skyland and KI's knowledge of earlier non-tempered glass top table injuries; (b) Skyland and KI's anticipation of future, non-tempered glass top table injuries; (c) Skyland's continued refusal to reveal its secret mark-up of the price of the Apollo 205 table set—it **still** could have changed to tempered glass at the price KI demanded; (d) KI's decision to

16

save money and continue to risk injuries to the public, rather than change to the original design—tempered glass.

After the *Amendment to Design and Supply Agreement* on March 1, 2000, Skyland made demand upon KI to handle the Katherine Ernest claim (see Exhibit 20).  On April 18, 2000, KI responded, indicating it was not responsible for Katherine Ernest's injury by the Palladium 204 table because it had been shipped before the threshold date identified in the *Amendment to the Design and Supply Agreement*. (see Exhibit 20). By April 18, 2000, both Skyland and KI knew of a serious injury to a small child caused by the same table as the Apollo 205.  They even debated responsibility for the injury claim.  Regardless, Skyland and KI continued to place over 50,000 of these 3-pack table sets into the stream of commerce.

### Three Years Later

Three years later, Philip Taylor was killed by an Apollo 205 cocktail table when he fell on it.



The post-mortem examination of Philip's body, ME-03-398, revealed:

> "The stab wound is caused by a 7-1/4 in. x 1-1/4 in. x 1/8 in. shard of clear glass. The shard of glass enters the left mid portion of the back, courses through posterior aspect of left rib #10, at the junction with the spine, causing complete transection of the rib.  The wound progresses superiorly to cause an incised wound of the left

lower lobe of the lung, and an incised wound of the thoracic aorta with associated mediastinal soft tissue hemorrhage.  The shard of glass penetrates the heart through the posterior aspect of the left atrium and ventricle and exits the anterior aspect of the heart through the superior aspect of the left ventricle.  It then penetrates the anterior left aspect of the pericardial sac and causes an incised wound of the sternum, just inferior to the insertion of left rib #2 and the sternum.  The stab wound progresses superiorly and from posterior to anterior.  The stab wound causes a left hemothorax of approximately 2 liters of blood and blood clot, a hemopericardium of approximately 75 cc of blood, and injuries to the previously described organs."

(Post Mortem Examination of the Body of Taylor, Philip—ME-03-398). (Exhibit 21)

### Both Skyland and KI Knew Non-Tempered Glass Top Tables Were More Dangerous Than Tempered Glass Top Tables

In addition to notice of five prior injury claims, followed by the shifting of financial responsibility for injury from Skyland to KI, it is clear Skyland and KI employees already knew non-tempered glass was more dangerous than tempered glass in the Apollo 205 table.

Skyland's Ron Pass testified:

> Q.  Okay.  And I'm -- what I'm asking you is, is that during your time with JDI, you learned that in addition to the benefits relative to shipping and handling, that the tempered glass was also a safer piece of glass for the consumer if you're going to use a 3/16-inch piece of glass?
> A.  Sure.  Yes.

(Pass Depo., 11/16/04, p. 21, ll. 7-13) (Exhibit 22)

KI's General Manager, Patrick Obriant, testified:

> A.  Well, I think if one breaks in round pieces and one has other random breakage, then it is potentially more dangerous.

(Patrick Obriant Depo., 11/9/04, p. 39, ll. 1-3). (Exhibit 1)

Klaussner CFO, David Bryant, testified:

> Q.  Okay.  I asked you earlier if you knew and understood that non-tempered glass in furniture was more dangerous than tempered glass in furniture, and you said that you did.  And is that because of the nature of the way that non-tempered glass breaks, versus the nature of the way that tempered glass breaks?
> A.  I don't know if the nature has anything to do with it.  I just know that it breaks. It breaks, and it will – I mean, the pieces will cut you.  It's fairly simple.

Q. They'll both break, and they'll both cut you.  But the severity of the cut is – the likelihood of having a more severe injury from a piece of broken glass in furniture is much higher with non-tempered glass, isn't it?

A.  I would think so, yes.

(David Bryant Depo., 1/12/05, p. 52, l. 21—p. 53, l., 12)  (Exhibit 18)

* * *

Q.     …You wouldn't expect the consumer of an Apollo 205-001 table to know and understand whether that glass was tempered or non-tempered, would you?

A.  I don't know.  I'm not---

Q.  There's no---

A.  I wouldn't buy a table like that, so I really can't put myself in their shoes.

Q.  Why not?  Why wouldn't you?

A.  Because of the looks.

Q.  Okay.  I mean, it's a cheap table; right?

A.  Exactly.

(David Bryant Depo., 1/12/05, p. 41, ll. 12-23).  (Exhibit 18)

* * *

A.  Steve, it's just very -- very difficult for me to answer that question.  I mean, as I said, I'm a consumer.  You're a consumer.  I bet you don't have any glass table top -- glass tables like that in your house.  What's the reason that you don't have glass table tops in your house like that?  It's the same reason that I don't.

Q.  And what is that reason?

**A.  I wouldn't want my kids, just like you said, wrestling around a table top like that.  But I also -- I don't like the styling of that, for one thing, but I wouldn't have a glass table top that's breakable, especially one that's in a room where there's a lot of activity.  Mine are confined to a room which has very little activity.  It's my dining room.** (Emphasis added).

(David Bryant Depo., 1/12/05, p. 50, ll. 1-16). (Exhibit 18)

KI and Skyland employees were also aware of the British Safety Standard, BS7376:1990, (Exhibit 23) which required the use of tempered glass in the Apollo 205 table.  (Haas Depo., 1/11/2005, p. 34-37) (Exhibit 24).   KI sold the Apollo 205 table in Britain and had to comply with the British Standard.  Skyland supplied the table to KI.  Still, neither KI nor Skyland discussed using tempered glass, even when they knew of injuries being caused by non-tempered glass top tables.

KI and Skyland argue they are not responsible for Philip's death because competitors were also allegedly selling non-tempered glass top tables.  But KI and Skyland knew of serious injuries caused by non-tempered glass.  As Skyland states in its Motion for Summary Judgment, it was an innovator in the

19

occasional table industry (then JDI).  And KI considered itself a leader in the occasional furniture industry, both in design and success.  (Patrick Obriant Depo., 11/9/04, pp., 194-195). (Exhibit 1). Once Skyland and KI knew of these serious injuries, they should have led the industry to use non-tempered glass.  Instead, they now hide behind the irresponsible and allegedly wide-spread practice of selling non-tempered glass top tables, even though they knew it was hurting consumers.

### HomeLife Knew or Should Have Known That the Apollo 205 3-pack Table Set was Dangerous

Joseph Baron was the CEO of HomeLife Corporation.  He understood that HomeLife was selling occasional furniture to the public that included glass tops.  He also understood that tempered glass was superior to non-tempered glass and that it would be safer for use in such a table.  (Baron Depo., 9/28/05, pp. 37-39).  (Exhibit 25).  HomeLife had a quality control department that dealt with damaged product.  Because non-tempered glass breaks much more easily than tempered glass, many of the shipments of Apollo 205 tables which HomeLife received included broken glass.  HomeLife tired of receiving damaged product due to broken glass. [Baron Depo., 9/28/05, pp. 33, 34, (Exhibit 25); Campbell Depo., 11/10/04, p. 41, (Exhibit 11)].  With knowledge of both non-tempered glass breakage and the danger of non-tempered glass versus tempered glass, CEO Baron testified that HomeLife did not consider safety relative to the glass top cocktail tables that it sold. (Baron Depo. 9/28/05, p. 36). (Exhibit 25).

### Warnings

Neither Klaussner nor Skyland ever considered placing warnings on these tables.  Chad Deters was Philip's roommate.  He bought the table on 3/26/2001 and believed the table was safe. "I didn't really even honestly think that they would make something that wasn't.  Again, it was a bad assumption on my part.  I mean, like I said, I've seen glass break, and I just can't honestly believe somebody would put non-tempered glass in a table like that." (Deters, 4/13/05, p. 95, ll. 4-9).  (Exhibit 3)

Philip's girlfriend, LeaAnn Breeden, who had seen the Apollo 205 glass top cocktail table on many occasions, also never considered that the table might be made from non-tempered glass.

20

A.   Based on law school, I just remember the one – the one case where somebody had fallen through a shower door and it was non-tempered glass and I assumed after that that everything was made of tempered glass.

Q.  And did you think that – like, for example, beverage containers of a – of a – a bottle of Coke or liquor, did you assume that those sorts of objects—

A.  No.

Q. – were made out of tempered glass?

A.  No.  But in terms of furniture –

Q.  Okay.

A. – I guess I always equated it to the shower door case, in my mind.  If it was something you could fall into, it was going to have tempered glass.

(Breeden Depo., 6/8/05. p. 93, ll. 16—p. 94, l. 7). (Exhibit 26)

Plaintiffs' experts, Graitcer and Wogalter, testified that the general public would reasonably expect this product to contain tempered glass because non-tempered glass is so obviously unsafe.  [Graitcer Depo., 8/9/05, Ex. 3, Report of Philip Graitcer, pp. 4-5, incorporated into his testimony, (See Exhibit 28); Wogalter Depo., 11/29/05, p. 30, Ex. 6, Report of Michael Wogalter, pp. 5-6, incorporated into his testimony, (See Exhibit 29)]

A warning regarding the use of non-tempered glass that could kill or seriously injure a user of the table was clearly not the best solution.  Making the cheap and easy design change to tempered glass was clearly the best solution.  However, if Chad Deters had been warned this table was made from non-tempered glass that could kill or seriously injure someone who came into contact with it, he either would not have bought the table, or if warned post-sale, would have discarded the table and/or the glass.

### Expert Proof

Dr. Alan Johnson needs little introduction in the Louisville area.  He has worked as a materials consultant during the design of products, during the evaluation of the performance of structures and products, and as a participant in failure analysis.  Glass is among the products and structures on which he has provided input.  He has taught materials on the fracture of glass at the University of Louisville almost every semester for 25 years.

21

Dr. Johnson thoroughly tested the Apollo 205 table, with both non-tempered and tempered glass. Five Apollo 205 tables, some with non-tempered glass, and some with tempered glass, were acquired by Dr. Johnson.[3]   Dr. Johnson's tests involved carefully controlled dropping of bags of sand of different weights from a height of 24 inches above the table top.  This height represents the approximate height of the center of gravity of a 6-foot-tall person.  Using one non-tempered exemplar glass table top, and four sheets of untempered soda glass purchased locally,[4] it was found in all five cases that a 5-pound weight was insufficient to break the glass.  However, a 10-pound weight caused it to shatter each time.  In a sixth test, a 7-pound weight shattered the non-tempered glass.



Dr. Johnson then tested the tempered glass which was sold with one of the exemplar Apollo 205 tables.  He conducted the same controlled drop test using the bags of sand.  He gradually increased the

---

[3] Recall that KI began to distribute the table with tempered glass once it learned Skyland was secretly marking up its profit, and once it learned it could manufacture the table with tempered glass as cheaply as Skyland's quote for non-tempered glass.

[4] Dr. Johnson's EDAX testing showed these glass sheets to be composed of essentially the same materials.

weight of the drop up to 40 pounds.  Even 40 pounds would not break the tempered glass.  Instead, the

40-pound drop drove the glass through the frame, deforming the metal tabs holding the glass in place.



Dr. Johnson concluded with a reasonable degree of scientific certainty that the use of non-

tempered glass in the Apollo 205 table constituted a serious design defect which makes the table

unreasonably dangerous.  He further concluded that if tempered glass had been used, it probably would

not have broken, and even if it had, it would have shattered into pebbles instead of the dangerous shards

created when non-tempered glass breaks.  (Johnson Depo., 7/5/05, Ex. 4, Report of Alan Johnson,

incorporated into his testimony, pages 1-7) (Exhibit 27).

Dr. George Nichols testified that Philip Taylor died as a result of hypovolemic shock and

exsanguination due to incisional injuries of the heart, aorta and lungs following a fall onto a glass

top cocktail table, and that a large shard of glass from the table top was the instrument which

caused the fatal injuries when it penetrated his body in much the same manner as a stab wound

from a knife.  Dr. Nichols further stated that if the table top had been made of tempered glass,

Philip would have only sustained soft-tissue injury (contusion), abrasions and a possible rib

fracture, along with a small cut or abrasions from the pebbles of tempered glass.  (Nichols Depo., 7/8/05, Ex. 1, Report of George Nichols, incorporated into his testimony, p. 3). (Exhibit 4).

In his experience as the Medical Examiner for the Commonwealth of Kentucky for over 20 years, Dr. Nichols was aware that falls occur in homes every day.  He concluded that since the Apollo 205 table was sold as domestic furniture, and given the quality of non-tempered glass, that the Apollo 205 cocktail table was inherently and unreasonably dangerous.  He also concluded that the Defendants' distribution of the Apollo 205 table with non-tempered glass constituted a reckless disregard for the lives and safety and people in close proximity to the tables, including Philip Taylor.  (Nichols' Depo., 7/8/05, Ex. 1, Report of George Nichols, incorporated into his testimony, pp.2-3). (Exhibit 4).

Plaintiff's expert, Dr. Philip Graitcer, DMD, developed, directed and supervised the Division of Consumer Injury Epidemiology and Control for the Centers for Disease Control and Prevention (CDC) from 1986 to 1990.  He served as the Medical Epidemiologist (Special Assistant) Office of the Director, National Center for Injury Prevention and Control (NCIPC), Centers for Disease Control and Prevention from 1990 to 1993.  From 1993 to the present, he has taught injury epidemiology and developed teaching and community service programs at Rollins School of Public Health, Emory University, while also serving as a consultant to provide technical assistance in the prevention and control of injury from consumer products.  (Graitcer Depo., 8/9/05, Ex. 1, Curriculum vita of Philip Graitcer, incorporated into his testimony, (See Exhibit 28).

Dr. Graitcer testified that a safety employee or consultant of any of the Defendants could have easily learned the following:

- Tempered glass has been available since the early 1900s.
- Its use in automobiles was adopted in the 1930s because people were being injured by non-tempered glass windows during accidents.

24

- In the 1950s and 1960s people were often injured by sliding non-tempered glass doors and storm doors.

- Tempered glass became the norm for these doors and other building code items in the late 1960s or early 1970s.

- Tempered glass became the norm because of the deaths and serious injuries that were being caused by non-tempered glass and because tempered glass easily and cheaply solved the problem.

(Graitcer Depo., 8/9/05, Ex. 3, Report of Philip Graitcer, pp. 4-8, incorporated into his testimony). (See Exhibit 28)

He also testified that a safety employee or consultant could have easily learned the following from the Consumer Product Safety Commission:

- Falls are the most common cause of injuries in the home.

- Hundreds of injuries related to falls onto tables are documented on the CPSC site.

- Extremely serious injuries were occurring from non-tempered glass top tables, during ordinary use, many from falls.

- 18 deaths reported from encounters with non-tempered glass top tables, during ordinary use, and many from falls, were reported on the CPSC site.

- These injuries and deaths are under-reported because only 100 hospitals in the nation are reporting to the CPSC in any given year.

(Graitcer Depo., 8/9/05, Ex. 3, Report of Philip Graitcer, pp. 15-16, incorporated into his testimony) (Exhibit 28).

A safety employee or consultant of any Defendant could have also easily learned that, even though under-reported, at least 18 people had died from severe lacerations and/or stabbing injuries resulting from contact with non-tempered glass top tables from 1983 to 2003.

25

**TABLE 1:  FATAL INJURIES INVOLVING GLASS TABLES – 1982-2004**
**CPSC DEATH FILES**

| Injury Date | Age | Loc. | Race | Sex | Work? | Narrative |
|---|---|---|---|---|---|---|
| 19820820 | 39 | H | W | M | N | HEMORRHAGE; LACERATION OF FACE - FALL ON GLASS COFFEE TABLE- AUTOPSY NO |
| 19850319 | 73 | H | W | M | N | ACUTE EXSANGUINATION; LACERATED LUNG & INTERCOSTAL ARTERY;    PENETRATING CHEST WOUND BY FRAGMENTED GLASS - FELL THROUGH GLASS TABLE - AUTOPSY YES |
| 19860222 | 28 | H | B | M | N | FELL ON GLASS TOP TABLE WHILE INTOXICATED - STAB WOUND OF ABDOMEN; FALL - ALCOHOL INTOXICATION - AUTOPSY YES |
| 19880826 | 37 | H | W | M | N | FELL ON GLASS TOP TABLE - EXSANGUINATION; INCISED WOUND OF    RIGHT ARM; FALLING ON GLASS TOP TABLE - PENDING TOXICOLOGY - AUTOPSY YES |
| 19921117 | 2 | H | W | M | N | JUMPING ON SOFA AND FELL OFF SOFA LANDING ON A GLASS COFFEE TABLE - TRAUMATIC PENETRATING WOUND OF ABDOMEN - AUTOPSY YES |
| 19920117 | 42 | H | B | M | N | ARM WRESTLING ON GLASS TOP TABLE.  GLASS BROKE CUT VICTIM - STABWOUND TO THIGH - AUTOPSY NO |
| 19930515 | 6 | H | W | F | N | FELL THROUGH GLASS TOP OF COFFEE TABLE, PIECE OF GLASS PIERCED NECK - STAB WOUND OF NECK - AUTOPSY YES |
| 19931206 | 40 | W | W | M | Y | CUT SELF ON BROKEN GLASS TABLE TOP - EXSANGUINATION; INCISED WOUNDS OF LIMBS - AUTOPSY YES |
| 19940620 | 2 | H | W | F | N | GLASS TABLE TOP FELL ON CHILD - GLASS INCISED WOUND OF NECK - AUTOPSY YES |
| 19941201 | 36 | H | W | F | N | FELL INTO GLASS TABLE - MULTIPLE INCISED WOUNDS - AUTOPSY YES |
| 19950206 | 69 | H | W | M | N | LACERATION ON FOREARM FROM FALL ONTO GLASS TABLE EXSANGUINATION; SHARP FORCE OF WRIST; FALL - ACUTE AND CHRONIC    ALCOHOL ABUSE - AUTOPSY NO |
| 19950824 | 41 | H | B | M | N | FELL ON TO GLASS TABLE - CUTTING WOUND OF CHEST COMPLICATING    ALCOHOLISM - AUTOPSY YES |
| 19950805 | 26 | H | W | M | N | FELL ON GLASS TABLE - LACERATION OF LIVER AND RIGHT KIDNEY WITH    COMPLICATIONS - AUTOPSY YES |
| 19960325 | 58 | H | B | F | N | DECEASED TRIPPED AND FELL ON GLASS TOP KITCHEN TABLE - CUT WOUND TO    RIGHT SIDE OF NECK INVOLVING BLOOD VESSELS; MASSIVE BLOOD CLOTS - AUTOPSY YES |
| 19970803 | 3 | H | W | M | N | FELL ON GLASS TABLE - SHARP FORCE INJURY OF NECK - AUTOPSY YES |
| 19980502 | 36 | H | W | M | N | FELL THROUGH GLASS TABLE - INCISED WOUND OF RIGHT RADIAL ARTERY; INCISED WOUND OF RIGHT FOREARM - COMBINED DRUG INTOXICATION (ETHANOL AND COCAINE) - AUTOPSY YES |
| 20000523 | 71 | H | W | M | N | FELL AT HOME AND STRUCK GLASS COFFEE TABLE - COMPLICATIONS OF    PENETRATING CHEST AND ABDOMINAL TRAUMA - AUTOPSY NO. |
| 20040303 | 18 | H | W | F | N | DECEDENT FELL ON GLASS TABLE - MULTIPLE SHARP FORCE INJURIES AUTOPSY YES. |

(Graitcer Depo., 8/9/05, Ex. 3, Report of Philip Graitcer, p. 9, incorporated into his testimony) (Exhibit 28).

Dr. Graitcer discussed three broad strategies used to prevent injuries:

▪ Persuade people at risk of injury to alter their behavior to increase self-protection; i.e., use smoke-detectors.

▪ Enforcement—require individual behavior change by law or code; i.e., require seat belts.

▪ Engineering and design—provide automatic protection by product or environmental design; i.e., built-in sprinkler systems that automatically extinguish fires.

26

Dr. Graitcer also testified that because all falls cannot be prevented, the best strategy for glass table injury prevention involves the engineering and design of glass tables to reduce or eliminate an injury when an individual falls into or on the glass top of an occasional table.

He discussed strategies to reduce or eliminate glass table top injuries:

- Prohibition and recall;

- Remove from dangerous location;

- Provide warnings, such as, "Warning: This table should not be used where the risk of human impact is likely," or the use of symbols putting users on notice of the dangerous nature of non-tempered glass (a person falling onto a knife blade, for example).

(Graitcer Depo., 8/9/05, Ex. 3, Report of Philip Graitcer, pp. 16-18, incorporated into his testimony) (Exhibit 28)

Dr. Graitcer testified that the only truly effective engineering strategy to prevent serious injury from glass top tables would be to replace non-tempered glass with tempered glass—a cheap, viable alternative to the dangers of non-tempered glass.  He pointed out that neither KI nor Skyland had engaged in the recall of the product or warnings about the danger of the product, pre- or post-sale.  He also testified that no safety measure should be considered in the design of glass top tables other than the use of tempered glass.

Dr. Graitcer opined that broken, non-tempered glass can cause serious and fatal injuries and should not have been used in the construction of the Apollo 205 table, that KI and Skyland knew that non-tempered glass was more dangerous than tempered glass, that Klaussner, Skyland and HomeLife knew or should have known that there have been fatal injuries caused by accidental falls onto or through glass top tables, that Klaussner, Skyland and HomeLife knew or should have known that falls occur frequently in the home and that the Apollo 205 table represented a fall injury hazard, and that Klaussner, Skyland and HomeLife, even though they knew or should have known, about the injury hazard posed by the Apollo 205 table, did not implement strategies to make the table safe.  He concluded that Klaussner and Skyland breached their duty to exercise ordinary care in the design, sale and/or distribution of the Apollo 205 table

27

because they failed to exercise the care of an ordinarily prudent designer, manufacturer, seller or distributor of such tables.  He concluded that HomeLife breached its duty to exercise ordinary care in the distribution of the Apollo 205 table because it failed to exercise the care of an ordinarily seller or distributor of such tables.  He concluded that the Apollo 205 table was in a defective condition, unreasonably dangerous to its users, including Philip Taylor.  He concluded that Klaussner, Skyland, HomeLife were grossly negligent because they exhibited a reckless disregard for the lives and safety of people using the Apollo 205 table, including Philip Taylor.  (Graitcer Depo., 8/9/05, Ex. 3, Report of Philip Graitcer, p. 22, incorporated into his testimony) (Exhibit 28).

Dr. William Smock, an emergency room doctor and renowned medical expert in the Louisville community, is Klaussner and Skyland's only expert.  Dr. Smock agreed that Philip Taylor would have received minimal injury, if any, if the Apollo 205 table had been constructed of tempered glass.  He offered no opinions that the non-tempered glass in the Apollo 205 table was safe, or that its use was appropriate.  (Smock Depo., 9/7/05, pp. 46-49). (Exhibit 5).

Dr. Michael Wogalter is a warnings expert from North Carolina State University.  Dr. Wogalter testified that the use of a warning in this case was an unacceptable alternative to changing from non-tempered to tempered glass.  However, since the Defendants placed this dangerous product on the market, Dr. Wogalter discussed warnings.  Neither KI nor Skyland attempted to warn the public in any way about the danger of non-tempered glass.  He opined that the public, consistent with the testimony of Chad Deters and LeaAnn Breeden, would not expect this table to made from non-tempered glass.  (Wogalter Depo., 11/28/05, Ex.6, Report of Michael Wogalter, pp. 5-6, incorporated into his testimony) (Exhibit 29).  Neither Philip Taylor nor Chad Deters was warned about the serious danger that this table posed to them.  They were not given the opportunity to make an informed decision about the table—whether to buy it, whether to remove it or whether to replace the glass.   They were not warned that they could be seriously injured by this table, instead of receiving a few scratches from tempered glass.  While warnings

could not make the non-tempered glass top table product safe, it could have at least made it safer by inducing people not to buy it or use it.  Accordingly, Dr. Wogalter found the Apollo 205 cocktail table to be defective and unreasonably dangerous in its intended function.  He also found Klaussner and Skyland's conduct to exhibit a reckless disregard for the lives and safety of the public, including Philip Taylor. (Wogalter Depo., 11/28/05, Ex.6,  Report of Michael Wogalter, p. 16, incorporated into his testimony) (Exhibit 29)

**ARGUMENT**

**I.  THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY<br>JUDGMENT ON THE CLAIMS OF NEGLIGENT DESIGN AND DESIGN DEFECT.**

The Defendants claim there are no genuine issues of material fact in the record regarding the negligent design and design defect of the Apollo 205 table.  This claim is astounding.  The record is replete with evidence which demonstrates clearly that the Apollo 205 table manufactured with non-tempered glass was defective in design and that the design was negligently implemented.  In the case quoted by the Defendants in their Motion for Summary Judgment, **Brock v. Caterpillar, Inc.**, 94 F.3d 220 (6th Cir. 1996), the court draws upon the holding of the court in **Montgomery Elevator Co. v. McCullough**, 676 S.W.2d 776 (Ky. 1984), for the factors to be taken into consideration in a products liability case:

> …(1) 'feasibility of making a safer product,' (2) 'patency of the danger,' (3) 'warnings and instructions,' (4) 'subsequent maintenance and repair,' (5) 'misuse,' and (6) 'inherently unsafe characteristics.'

When these factors are applied to the present case, the Defendants' arguments become not only weak, but truly incredible.

First, the record demonstrates through testimony of numerous defense witnesses and Plaintiff's experts that, regarding feasibility of making a safer product, it would have been simple to replace the non-tempered glass used in the Apollo 205 table with tempered glass.  The choice to use non-tempered glass

29

has repeatedly been shown to be based on a cost savings, not the difficulty of substituting tempered glass. The record shows that all Defendants played a role in making the decision to use non-tempered glass in the table.  Skyland designed the Apollo 205 from a composite of several tables it had designed in the past, arranged for a prototype of the table to be manufactured in China and presented the table to Klaussner for its approval.  (Pass Depo., 6/4/04, pp. 26-27). (Exhibit 10).  Skyland recommended the use of tempered glass in the Apollo 205 at a price of $64.75, but lied about its manufacturing cost.  [Pass Depo., 6/4/04, p. 29, (Exhibit 10); Patrick Obriant Depo., 11/9/04, pp. 18, 22, 112, 113, (Exhibit 1); Patrick Obriant Depo., 4/7/04, pp. 39-41 (Exhibit 8)].  HomeLife, being courted as a huge customer for KFI and KI, put the pricing pressure on KFI and KI to reduce the price of the Apollo 205 table set from $100.00 to $95.00, never asking what type glass would be used.  To meet the price point and to sell both the upholstered and occasional furniture produced under the Klaussner umbrella, and to avoid losing money, KI chose non-tempered glass.  (York Depo., 11/10/04, pp. 64-65). (Exhibit 12). The Apollo 205 manufacturing process began in early 1999 with non-tempered glass based on the pricing negotiated between Skyland, KI, KFI and HomeLife, with no regard for the public's safety.

Second, the danger of using non-tempered glass was known to Skyland and KI – so well-known that these Defendants made financial arrangements to shift responsibility for injuries from Skyland to KI, which could still obtain insurance for non-tempered glass injury claims.  These Defendants attempt to diffuse the issue of their knowledge of the dangers with the argument that many furniture manufacturers who made glass top furniture used non-tempered glass.  This argument is truly a desperate one, and one that is not substantiated by the record.

Kentucky courts held early on that the fact an entire industry adopts careless methods or uncontrolled standards of design and production does not relieve a manufacturer or distributor of liability for acting within those standards or methods. **Herme v. Tway**, 294 S.W.2d 534 (Ky. 1956).  As stated by the court in **Owens-Corning Fiberglas Corporation v. Golightly**, 976 S.W.2d 409 (Ky. 1998), quoting

**Jones v. Hutchinson Manufacturing, Inc.**, 502 S.W.2d 66 (Ky.App. 1973), "If the only test is to be that which has been done before, no industry or group will ever have any great incentive to make progress in the direction of safety."

The Defendants in this case cannot use as their defense, "The industry made us do it."  The Klaussner Defendants were and are a huge player in the furniture industry.  Skyland was an innovator in the importation of occasional furniture.  They argue they followed the industry standards which they played a part in creating; therefore, they must have acted prudently.  Such circular reasoning cannot stand.  The Defendants have admitted knowledge of the dangers of non-tempered glass and have admitted that lower production cost was their motivation in using non-tempered rather than tempered glass.  The fact that others in the furniture industry used non-tempered glass does nothing to excuse the negligent conduct of the Defendants.  They acted with knowledge that they were placing a dangerous product not only into the stream of commerce, but into homes where people could be injured or killed by using the product in the manner for which it was intended.

The evidence also demonstrates HomeLife's knowledge of the danger involved in using non-tempered glass in the Apollo 205 table.  CEO Baron knew tempered glass was safer for the consumer.  HomeLife complained repeatedly about glass breakage of the table tops shipped to them.  [Baron Depo., 9/28/05, pp. 33, 34, (Exhibit 24); Campbell Depo., 11/10/04, p. 41, (Exhibit 11)].  Even though HomeLife saw first-hand how easily the glass table tops broke and in what condition the glass broke, i.e. large, lethal shards of glass, it never took steps to stop distribution of the dangerous Apollo 205 table – instead it sold 50,000 sets of them.

Third, the record shows there were no warnings at all given by any of the Defendants about the dangers of non-tempered glass in home furniture.  All of the Defendants, Skyland, KFI, KI, and HomeLife, knew of the dangers of the Apollo 205 table and gave no warnings.  As the designers, Skyland and KI had the responsibility for providing a warning about the dangers of the non-tempered glass table

31

top.  Design of a product includes, as part of the design, instructions and warnings to accompany the product.  See **Byrd v. Proctor& Gamble Manufacturing Co.**, 629 F.Supp. 602 (E.D. Ky. 1986).  As stated by the court in **C & S Fuel, Inc. v. Clark Equipment Co.**, 552 F.Supp.340 (E.D.Ky. 1982), "A product may be unreasonably dangerous in design, unless accompanied by a warning that it should not be put to a certain use."  See also **Leonard v. Uniroyal, Inc.**, 765 F.2d 560 (6th Cir. 1985).  In other words, an adequate warning can render a dangerous product safe[5], if properly composed and properly distributed to the consumer.  No Defendant ever made any effort to set out any type of warning at all, either pre- or post-sale of the Apollo 205 table, despite direct notice that its exact counterpart, the Palladium 204, had injured 10-year-old Katherine Ernest.

        The fourth and fifth factors set out above are not issues in this case. There is no allegation of maintenance or repair or misuse of the table. Sixth and finally, there is ample evidence that non-tempered glass is inherently dangerous and that the Defendants knew of the dangers. Each of the Defendants was aware of the inherent danger of non-tempered glass. Klaussner CFO, David Bryant, made the knowledge of his companies quite clear:

> Q.  Okay.  I asked you earlier if you knew and understood that non-tempered glass in furniture was more dangerous than tempered glass in furniture, and you said that you did.  And is that because of the nature of the way that non-tempered glass breaks, versus the nature of the way that tempered glass breaks?
> A.  I don't know if the nature has anything to do with it.  I just know that it breaks. It breaks, and it will – I mean, the pieces will cut you.  It's fairly simple.
> Q.  They'll both break, and they'll both cut you.  But the severity of the cut is – the likelihood of having a more severe injury from a piece of broken glass in furniture is much higher with non-tempered glass, isn't it?
> A.  I would think so, yes.

(David Bryant Depo., 1/12/05, p. 52, l. 21—p. 53, l. 12) (Exhibit 18).

                                        * * *

> Q.       …You wouldn't expect the consumer of an Apollo 205-001 table to know and understand whether that glass was tempered or non-tempered, would you?
>  A.   I don't know.  I'm not---
> Q.   There's no---
> A.   I wouldn't buy a table like that, so I really can't put myself in their shoes.
> Q.   Why not?  Why wouldn't you?

---

[5] Here, an effective warning would have induced customers not to buy the Apollo 205 table, the only way the customer could be safe.

A. Because of the looks.
Q. Okay. I mean, it's a cheap table; right?
A. Exactly.

(David Bryant Depo., 1/12/05, p. 41, ll. 12-23). (Exhibit 18).

* * *

A. Steve, it's just very -- very difficult for me to answer that question. I mean, as I said, I'm a consumer. You're a consumer. I bet you don't have any glass table top -- glass tables like that in your house. What's the reason that you don't have glass table tops in your house like that? It's the same reason that I don't.
Q. And what is that reason?
A. **I wouldn't want my kids, just like you said, wrestling around a table top like that. But I also -- I don't like the styling of that, for one thing, but I wouldn't have a glass table top that's breakable, especially one that's in a room where there's a lot of activity. Mine are confined to a room which has very little activity. It's my dining room.** (Emphasis added).

(David Bryant Depo., 1/12/05, p. 50, ll. 1-16). (Exhibit 18).

There is substantial evidence that the negligent actions of the Defendants caused Philip Taylor's death.

The Defendants are not entitled to summary judgment on this issue.

## II.  THE EVIDENCE PROVES SKYLAND'S ROLE IN PLACING THE APOLLO 205 TABLE WITH NON-TEMPERED GLASS INTO THE STREAM OF COMMERCE

However convoluted Defendant Skyland seeks to make the issues in this case, the question remains very simple: were Skyland's actions those of an ordinarily prudent designer and sourcing agent engaged in the design, manufacture and sale of similar products? Clearly, they were not.

Skyland's knowledge of the danger of using non-tempered glass in the Apollo 205 table; their knowledge of prior injuries caused by non-tempered glass-top tables; their deceit in inducing KI to shop for a cheaper price; their unapologetically commercial attitude in using the glass to achieve a greater profit margin; their post-Katherine-Ernest-injury failure to remedy the dangerous condition of the Apollo 205 by acknowledging its secret markup and making the change to tempered glass – all dictate against summary judgment. Skyland is not entitled to judgment as a matter of law.  FRCP 56.

Skyland's liability begins with its failure to make clear the fact that non-tempered glass was a danger when used in the Apollo 205 table.  The evidence shows Skyland knew of claims arising from injuries caused by the non-tempered glass table tops, yet Skyland and Ron Pass failed to make an issue of

33

the danger.  Skyland claims it was merely a designer of the table and created its design based on the

specifications of KI.  Skyland's argument is that after the design was completed and the sourcing to the

manufacturing company was consummated, Skyland was out of the picture and cannot be deemed as a

part of the mechanism which placed the Apollo 205 table into the stream of commerce.  Kentucky law

views Skyland's participation in a different light.

In **Taylor v. General Motors, Inc.**, 537 F.Supp. 949 (E.D. Ky. 1982), the court reviewed the

question of which entities bore responsibility for placing a product in the stream of commerce for

purposes of strict liability in a products liability case.  The court adopted the rationale of a California case:

> '…under the stream of commerce approach to strict liability
> no precise legal relationship to the member of the enterprise
> causing the defect to be manufactured or to the member most
> closely connected with the customer is required before the courts
> will impose strict liability.  **It is the defendant's participatory
> connection, for his personal profit or other benefit, with the
> injury-producing product and with the enterprise that
> created consumer demand for and reliance upon the product
> (and not the defendant's legal relationship such as agency
> with the manufacturer or other entities involved in the
> manufacturing-marketing system) which calls for imposition
> of strict liability.** …   The precise legal relationship between
> the parties has not played a particularly significant role in the
> cases imposing strict liability.'  **Kasel v. Remington Arms
> Company**, 24 Cal.App.3d 711, 101 Cal.Rptr. 314 (1972).
> [Emphasis added].[6]

The **Taylor** court went on to discuss the convincing nature of the control G.M. exercised over the design

and testing of the fan blade which was the subject of the case.

The rationale adopted by the court in **Taylor** is equally applicable in this case.  Skyland labels

itself as a "mere" design and sourcing agent for the Apollo 205 table, claiming it had no authority to

overrule KI's decision to use non-tempered glass in the table top.  Skyland, however, had secret control of

KI's glass cost.  It is disingenuous, even deceitful, for Skyland to claim its hands were clean after creating

---

[6] As stated in Skyland's own pleadings, on page 8 of its Motion for Summary Judgment, the standard in Kentucky for examining a case claiming deficient design is the same under strict liability and negligence—reasonable care on the part of the actor.

34

the pricing issue by its secret markup, then "acquiescing" in the use of non-tempered glass, knowing all the while about the dangers of the proposed use of non-tempered glass, and knowing it was supposed to price the table with tempered glass, without markup.

Further, as the designer, Skyland had the responsibility for providing a warning about the dangers of the non-tempered glass table top, as set out hereinabove. Skyland's claims that its hands are clean because of its place in the continuum of participants placing the Apollo 205 table into the stream of commerce are frighteningly out of touch with reality. Skyland was not a puppet being manipulated by KI's decisions. If anything, the opposite was true.

### III. THERE IS EXTENSIVE EVIDENCE THE DEFENDANTS WERE NEGLIGENT IN TESTING THE DANGERS OF NON-TEMPERED GLASS IN THE APOLLO 205 TABLE

Defendants claim the Plaintiff has not proven they were negligent in failing to test the non-tempered glass for safe use in the Apollo 205 table. The reality is that Defendants did not want to test or investigate the safety of non-tempered glass-top tables. They already knew it was dangerous, but each Defendant had its own financial reason for using non-tempered glass anyway.

Plaintiff's experts and defense witnesses have proven how easily Defendants could have tested and investigated non-tempered glass in the Apollo 205 table, how easily Defendants should have concluded it was too dangerous to use, and how easily Defendants could have designed a safe, feasible and cheap alternative to non-tempered glass. Determining that non-tempered glass breaks into knife-like shards is straightforward, as is determining the breakage pattern of tempered glass. Determining how much force is needed to break the non-tempered versus tempered glass in the Apollo 205 is also straightforward. Discovering the history of the danger of non-tempered glass when human contact is likely, as well as the reasons for using tempered glass instead, is also not a challenging process. Discovery of the CPSC information regarding injuries and deaths from glass-top tables is only a matter of accessing public records. Plaintiff not only proves the ease of testing and investigating the use of non-

tempered glass in the Apollo 205 table, but also proves the defendants were willful and reckless when they decided to use non-tempered glass in the Apollo 205 table.

## IV.  KFI AND KLAUSSNER INTERNATIONAL WORKED IN CONCERT TO PLACE THE APOLLO 205 TABLE INTO THE STREAM OF COMMERCE

KFI claims it played no role in placing the Apollo 205 into the stream of commerce, and is so separate in identity from KI that KFI cannot bear any responsibility for any action or inaction of KI.  The record demonstrates this is not the case.  KFI designs and manufactures upholstered furniture.  KI designs occasional furniture.  Both are under the leadership of J.B. Davis as President.  The two companies negotiated the sale of their furniture as a package deal when selling rooms of furniture to HomeLife.

Even the salespeople for KFI and KI did not realize any serious distinction between the two companies as they attempted to sell their products to HomeLife.  Darrin York began to implement the introduction of occasional tables to go with the upholstery line.  He did not know whether his introduction of occasional tables to go with upholstery was being done for KFI or KI.  (York Depo., 11/10/04, pp. 8,9). (Exhibit 12). KFI employee Larry Phillips and KI employee Todd Campbell began working together to implement the sale of both occasional furniture and upholstered furniture to HomeLife, as a grouping of furniture.  (Phillips Depo., 1/12/05, pp. 17, 18). (Exhibit 13). Phillips and Campbell, for KFI and KI, worked together to set a price for both the upholstered and occasional furniture sold to HomeLife.  Their work resulted in the $95 Apollo 205 price and the choice to use non-tempered glass.  There was no real distinction between KFI and KI for purposes of the sale of furniture to HomeLife.  They worked together to price the Apollo 205 table to maximize the sales of KFI and KI on many lines of furniture.

## V.  THE RECORD SUPPORTS PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES

Defendants KI and Skyland argue the Plaintiff has set out no evidence upon which a claim for punitive damages may be based.  The non-tempered glass used in the Apollo 205 table was inherently dangerous and these Defendants had knowledge that it had caused injuries in the past.  The reasons the Defendants used non-tempered glass, in spite of their knowledge of its dangers and of existing injury

claims related to its use, were sales and profit, pure and simple.  There were no attempts to test the glass or to obtain more information about the safety or lack thereof of the glass, because these Defendants already knew the glass was dangerous and wanted to use it to save money, while meeting HomeLife's pricing pressure.  There were no discussions among the Defendants about the safety of the glass or the feasibility of any other design—cost-cutting was the objective.[7]  Of course, once the decision was made to use the dangerous, non-tempered glass, no warnings were used because there would have been no sales.

In **Golightly**, *supra*, the court held a jury's imposition of punitive damages was supported by the evidence when proof in the record showed

> …OCF [defendant/manufacturer] knew of the health risks associated with the use of Kaylo [product] both before and during the time it manufactured the product and placed it in the stream of commerce; and … it knowingly marketed Kaylo without warning labels, and concealed, minimized and/or misrepresented in its advertisements the health risks involved in working with the product.

The court went on to find that an award of punitive damages must include consideration of both the nature of the defendant's conduct and the resulting harm to the plaintiff.  See also **Sufix, U.S.A., Inc. v. Cook**, 128 S.W.3d 838 (Ky.App. 2004).[8]

Defendants KI and Skyland claim ignorance of prior injuries and the dangers of non-tempered glass.  Their ignorance was willful.  They were aware of claims of injuries, some very severe, caused by non-tempered glass top tables, and even an injury caused by the Apollo's counterpart, the Palladium 204.  The evidence shows KI and Skyland had access to as much detail as they desired regarding these claims,

---

[7] The Defendants cite **Parker v. Henry A. Petter Supply Co.**, 165 S.W.3d 464 (Ky.App. 2005), for the proposition that knowledge of dangers within a scientific community does not necessarily raise the inference that the general industry population had knowledge of the same dangers.  The holding stands for exactly the opposite.  The court held that summary judgment was inappropriate when the Plaintiff had submitted evidence that dangers of the product in question were known in the medical and scientific community and could have been discovered by the manufacturers and retailers in the case.  Plus, the dangers of non-tempered glass versus tempered glass are well-known facts.

[8] In **Sufix**, the court found a sufficient basis for a punitive damages jury instruction when the plaintiff proved the Defendant manufacturer had not tested the defective product thoroughly as it should have done.  In this case, no one tested the glass which was known to have inherently dangerous propensities.  This fact alone is enough evidence from which a jury could infer gross negligence or reckless disregard which would justify punitive damages.

yet they ignored the claims.  HomeLife had many incidents of the non-tempered glass table tops in the Apollo 205 table breaking in shipping.  All Defendants knew how dangerous the glass in the Apollo 205 table was, and all ignored those dangers in their zeal to make a higher profit.

The Defendants claim they cannot be punished for extraterritorial misconduct, i.e. punitive damages cannot be awarded to punish for conduct outside the jurisdiction of the instant case.  The court in **Sand Hill Energy, Inc. v. Smith**, 142 S.W.3d 153 (Ky. 2004), set out the appropriate standard for punitive damages when some of the evidence in the case goes to a defendant's misconduct outside the jurisdiction.  The court set out an appropriate jury instruction which would permit a jury to consider evidence of a defendant's conduct outside the jurisdiction in determining whether the conduct inside the jurisdiction was reprehensible and the degree of reprehensibility.  The extraterritorial conduct cannot be considered to award damages in the instant case to punish for conduct occurring outside the state.  In other words, the court and/or jury can consider evidence of the injuries occurring outside Kentucky from the Defendants' use of non-tempered glass in their furniture in order to determine whether the Defendants' actions which killed Philip Taylor are reprehensible and to what degree they are reprehensible.  The court and/or jury cannot award the Plaintiff in this case punitive damages which go to punish the Defendants for their misconduct outside Kentucky; however, the question of punitive damages goes to the jury.

In this case, the Defendants are in the same position as OCF in the **Golightly** case.  The Defendants knew of the dangers of the non-tempered glass used in the Apollo 205 table, they knew it was feasible and affordable to correct the danger, they gave no warnings and marketed the table as if it were any other piece of furniture.  The Defendants' conduct shows a flagrant indifference to the rights and safety of the persons who took the Apollo 205 table into their homes for normal household use, and that indifference caused Philip Taylor's death.  Punitive damages have never been more justified than in this case.

38

## VI.  THE BREACH OF WARRANTY CLAIM AGAINST HOMELIFE
## IS SUPPORTED BY KENTUCKY LAW AND THE EVIDENCE

The breach of warranty claims against Klaussner and Skyland should be dismissed.  The Defendant HomeLife claims the Plaintiff's allegation of breach of implied warranty of fitness fails because Philip Taylor was not in privity with it.  While Kentucky law is somewhat conflicted on this point, there is no question that Kentucky recognizes a duty on the part of a seller to any natural person in the buyer's household, or a guest in the buyer's home, if it is reasonable to expect the person might use or be affected by the product in question.  KRS 355.2-318.  Based on the holding by the court in **Williams v. Fulmer**, 695 S.W.2d 411 (Ky. 1985), Philip Taylor is considered a beneficiary of the implied warranty between Chad Deters, the purchaser of the table in this case, and HomeLife.  Philip was a member of Chad Deter's household, and it was reasonably foreseeable that anyone in the home would make ordinary use of the table.

As has been demonstrated throughout this Response, genuine issues of material fact exist as to the defective nature of the product and HomeLife's knowledge of the defect and its potential consequences.  HomeLife sold the Apollo 205 table in a defective condition, and Philip Taylor was a foreseeable user of the product in its defective condition.  Plaintiff's claim of breach of warranty against HomeLife should go to the jury.

### CONCLUSION

The Defendants in this case have made a futile attempt to claim they bear no responsibility in the death of Philip Taylor.  The evidence, however, speaks overwhelmingly to the liability of each of the Defendants – KFI, KI, Skyland and HomeLife.  Each was aware of the defective condition of the Apollo 205 table caused by the decision to use non-tempered glass in the table's design and construction.  The evidence in this case is staggering in its complete proof of all Defendants' failure to meet any of their duties to Philip Taylor.  Summary judgment cannot be granted in this case.

Respectfully submitted this 17th day of January, 2006.

THE LAW OFFICES OF STEVEN D. DOWNEY
Attorney at Law
537 East 10th St.
P.O. Box 3250
Bowling Green, KY 42102-3250
Phone:  (270) 782-3580
Fax:    (270) 782-6095
And
Douglas B. Taylor
Taylor & DeGolian
First Trust Centre
200 South Fifth St., Ste. 400 So.
Louisville KY 40202
Phone: (502)583-5581
Fax:  (502)583-9622


s/Steven D. Downey
Attorneys for Plaintiff


Certificate of Service:

        I hereby certify that on January 17, 2006, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:  Hon. Kenneth P. O'Brien, Hon. Ann Toni Kereiakes and Hon. Edward H. Bartenstein.


s/ Steven D. Downey, Attorney for Plaintiff


40